IN THE SUPREME COURT OF THE STATE OF IDAHO
Docket No. 39249

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | **Boise, April 2014 Term** |
| Plaintiff-Respondent, | ) | |
| | ) | **2015 Opinion No. 71** |
| v. | ) | |
| | ) | **Filed:  July 21, 2015** |
| DANIEL EDWARD EHRLICK, JR., | ) | |
| | ) | **Stephen Kenyon, Clerk** |
| Defendant-Appellant. | ) | |
| | ) | **SUBSTITUTE OPINION, THE** |
| | ) | **COURT'S PRIOR OPINION** |
| | ) | **DATED APRIL 27, 2015 IS** |
| | ) | **HEREBY WITHDRAWN.** |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Darla S. Williamson, District Judge.

The judgment of conviction for first-degree murder and failure to report a death to law enforcement is <u>affirmed</u>.

Sara B. Thomas, State Appellate Public Defender, Boise, for appellant.  Elizabeth Allred argued.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.  Kenneth K. Jorgensen argued.

_____

HORTON, Justice.

Daniel Ehrlick appeals from his conviction for the first-degree murder of a child and the failure to report the death to law enforcement. On appeal, Ehrlick alleges that the trial court committed multiple errors in the admission of evidence and that the prosecution violated his Fourteenth Amendment right to a fair trial by committing multiple acts of prosecutorial misconduct. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2009, at 10:11 p.m., the Ada County Sheriff's dispatch received an emergency call from Ehrlick reporting that R.M., the eight-year-old son of his live-in girlfriend, Melissa Jenkins, was missing. Ehrlick told dispatchers that R.M. was last seen at 7:00 p.m. on

1

July 24, he had been searching for R.M. for several hours, and everyone was telling him that R.M. was at a birthday party. In the ensuing days, an extensive search was launched to find R.M. The searchers included members of several law enforcement agencies and dozens of citizen volunteers. R.M.'s body was found on August 3, 2009, floating face down in the New York Canal. A large rock was stuffed into a closed cargo pocket of his pants. No evidence was offered as to how, or precisely when, R.M.'s body was placed in the canal. R.M.'s corpse exhibited extensive injuries, including multiple compression injuries to the abdomen and a blow to the head. Both the compression injuries and the head injury were potentially fatal wounds on their own, but would not have resulted in instantaneous death. The State's forensic pathologist, Dr. Glen Groben, testified that R.M.'s death was caused by blunt force trauma to the head and torso due to an assault.

During the summer months of 2009, R.M. was residing with Jenkins and Ehrlick at the Oak Park Village Apartment Complex. The complex consists of several large apartment buildings, a central office/club house, and multiple community areas, including a swimming pool, park, and playground. The complex is located about a quarter-mile from the New York Canal.

As time passed, investigators began to suspect Ehrlick and Jenkins were involved in R.M.'s disappearance. Investigators searched the couple's apartment on July 30 and 31, finding a piece of paper taped to a wall which concealed a hole in the drywall. Considering this possible evidence, investigators cut a section of sheetrock containing the hole out of the wall. Investigators eventually had the section of sheetrock scanned in order to create a three dimensional plastic model that was introduced at trial. Investigators suspected that the hole was created when Ehrlick slammed R.M.'s head into the wall.[1]

On August 18, 2009, an Ada County grand jury returned an indictment charging Ehrlick with first-degree murder and failure to report a death to law enforcement. The matter proceeded to trial. On June 30, 2011, the jury unanimously found Ehrlick guilty of both charges. The district court sentenced Ehrlick to two fixed consecutive life sentences. Ehrlick timely appealed.

**A. The Birthday Party.**

At trial, and in the parties' appellate arguments, there was extensive discussion regarding the occurrence or non-occurrence of a birthday party somewhere within the apartment complex

---

[1] Ehrlick provided varying explanations about the cause of the hole in the wall.

2

on July 24. Accordingly, a somewhat detailed factual background may assist in understanding the parties' arguments as they relate to the occurrence or non-occurrence of a birthday party on July 24.

The first mention of the birthday party came in Ehrlick's call to 911 on the evening of July 24. Ehrlick told the dispatcher, "I've been out looking for a couple of hours around our apartment complex …. Everybody keeps directing me to the–a birthday party. That's where everybody's saying that he's at but I can't find this birthday party or nothing." When officers subsequently contacted Ehrlick, he told Officer Guy McKean that R.M. had come into the apartment from playing outside three times between 7:00 p.m. and 7:30 p.m. to ask if he could go to a birthday party, and each time Ehrlick told R.M. that he could not. Around 10:00 p.m. on July 24, a security guard for the complex heard Ehrlick by the community pool asking residents if they knew of a birthday party, and if so, where it might be.

At trial, there was no evidence that a birthday party took place within the apartment complex on July 24. The State's theory throughout the trial was that Ehrlick and Jenkins fabricated the story of a birthday party in order to distract law enforcement and deflect attention from themselves.[2] In support of this theory, the State introduced evidence that no birthday party occurred and that a birthday party at that late hour did not make sense. Ehrlick maintains that the actual existence of a party is irrelevant because he never said that there was in fact a party, just that R.M. had asked to go to a party.

## B. Ehrlick's physical abuse of R.M.

Much of the State's evidence in this case involved the nature and extent of Ehrlick's physical and emotional abuse of R.M. Ehrlick's methods of child discipline—and his related terminology—may charitably be characterized as unconventional. The first was "dead bugging," where Ehrlick would force R.M. to lay on his back on the floor and raise his arms and legs, keeping them perpendicular to the floor. The second was "the wall," where Ehrlick would force R.M. to press his face and knees up against a wall while crouching. Third, Ehrlick forced R.M. to maintain "the chair," where R.M. would place his back against a wall with bent knees and hold

---

[2] As additional evidence that Jenkins and Ehrlick fabricated stories to obstruct the investigation, the State offered testimony from Detective Glen Rawson. Rawson testified that on July 25 at approximately 4:00 a.m., he received a call from Jenkins that Ehrlick had found a package of Jimmy Dean sausage biscuits like the ones they kept in their freezer in the bushes outside their building. Rawson went to the scene. Upon his arrival, Ehrlick emphatically told Rawson that the package in the bushes showed that R.M. had run away and tried to take food with him. However, when Rawson collected the package from the bushes, it was still very cold to the touch.

the position as long as possible. Ehrlick also struck R.M. with a board. R.M. often sustained bruising as a result of Ehrlick's discipline. To hide this bruising from health and welfare workers during their visits to the home, Ehrlick and Jenkins told elaborate lies and hid R.M. in their closet.

## C. The State's timeline.

Throughout the trial, the State's theory was that R.M. was not seen by any witness on July 24 because he was either dead or dying and was unable to go outside. For this reason, the State went to great lengths to discredit all witness accounts that presented claims of seeing or speaking with R.M. on July 24.

## II. STANDARD OF REVIEW

> This Court reviews questions regarding the admissibility of evidence using a mixed standard of review. *State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008). First, whether the evidence is relevant is a matter of law that is subject to free review. *State v. Field*, 144 Idaho 559, 569, 165 P.3d 273, 283 (2007). Second, we review the district court's determination of whether the probative value of the evidence outweighs its prejudicial effect for an abuse of discretion. *Stevens*, 146 Idaho at 143, 191 P.3d at 221. We determine whether the district court abused its discretion by examining: (1) whether the court correctly perceived the issue as one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently within the applicable legal standards; and (3) whether the court reached its decision by an exercise of reason. *Id.* However, an abuse of discretion may be deemed harmless if a substantial right is not affected. *State v. Thompson*, 132 Idaho 628, 636, 977 P.2d 890, 898 (1999). "In the case of an incorrect ruling regarding evidence, this Court will grant relief on appeal only if the error affects a substantial right of one of the parties." *Obendorf v. Terra Hug Spray Co.*, 145 Idaho 892, 897, 188 P.3d 834, 839 (2008); I.R.E. 103(a). "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52.

*State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010).

## III. ISSUES ON APPEAL

1. Did the district court err by admitting testimony from an investigator that witnesses who saw R.M. on July 24 were not credible?

2. Did the district court err by admitting a model of R.M.'s head?

3. Did the district court err by admitting certain I.R.E. 404(b) evidence?

4. Did the district court err by holding that statements made by Samantha Burnett were not hearsay?

5. Did the district court err by excluding statements to law enforcement officers on the basis that the statements were hearsay?

6.  Did the prosecution commit misconduct?

## IV. ANALYSIS

**A. The district court abused its discretion in admitting testimony from Agent Martin that no witnesses who claimed to have seen R.M. on July 24 were credible; however, the error was harmless.**

The State called Mary Martin, an FBI agent assigned to investigate cases involving crimes against children. Martin became involved in the search for R.M. on July 27. Initially, Agent Martin was assigned to follow up on any leads that came in. She was later asked to create a timeline focused on establishing the last time R.M. was seen. Martin testified that every lead that came in on R.M.'s case was investigated by the Boise Police Department or the FBI. Over a defense objection, Martin testified that, based on all of the leads and all of the reports she reviewed, it was not possible for R.M. to have been at all of the places where witnesses reported having seen him.

Martin interviewed K.D.,[3] a seven-year-old resident of the complex, who claimed she had seen R.M. on July 24. Martin testified that K.D. had been interviewed on two prior occasions and that in each instance there were inconsistencies in her reports. The prosecution then asked Martin, "[B]ased on your investigation–were you able to determine whether or not that was a credible lead or a credible last sighting?" Defense counsel objected, arguing that credibility was for the jury to decide. The district court asked the prosecutor if Martin's opinion was based upon her "expertise." The prosecutor responded that it was based upon Martin's expertise and investigation. The district court overruled the objection and Martin testified that she determined that K.D.'s report of seeing R.M. on July 24 was not a credible lead or last sighting.

Martin also examined reports from two other children who resided in the apartment complex, O.J. and I.T. O.J. and I.T. both claimed to have seen R.M. on July 24. Martin did not interview O.J. or I.T., but found inconsistences in their statements to law enforcement and determined that neither provided a credible last sighting of R.M. Defense counsel again objected to Martin testifying that O.J. and I.T.'s statements were not credible, arguing that it invaded the province of the jury. The district court again overruled the objection. Ultimately, Martin testified that the law enforcement investigation did not produce any credible sightings of R.M. on July 24.

The defense called O.J. as a witness at trial. O.J. testified that in the summer of 2009 he was thirteen years old and had lived at the apartment complex for approximately one year. He

---

[3] K.D. was not called as a witness.

testified that he had known R.M. for about two weeks before he went missing and that he saw R.M. on a swing set in the apartment complex's park on July 24 sometime after noon and again by the complex's pool area later in the day. On cross-examination, O.J. was impeached with multiple prior inconsistent statements.

Defense counsel also called two witnesses who were not directly identified in Martin's testimony.[4] Both testified that they saw R.M. at the pool on the evening of July 24. The first, Jennifer Hastings, testified that she was sitting on the edge of the community pool on July 24 while her son swam. Hastings stated that she and her son left the pool sometime between 8:00 and 9:30 p.m. Hastings testified that, late in the evening of July 24, an officer showed her a photo of R.M. and that she was fairly certain she had briefly seen the boy playing by the pool earlier that evening. She said that R.M. was wearing shorts and a t-shirt. On cross-examination, the prosecutors confronted Hastings with a form she filled out shortly after July 24 that asked her to "[d]escribe in your own words everything that occurred on the day of the disappearance, from the time you got up until the time you went to sleep. Include everywhere you went; everything you did; and everyone you interacted with … no detail is too small. Everything is important." Hastings wrote:

> I got up about 9:30ish. Had my children get ready for the day. They went outside to play and walk the dog about 10:30. I went and checked on them about 11 o'clock a.m. At that time, I saw a white, older van mid-80s, driving around the complex. I saw it enter and leave two or three times. Driving slowly. I thought nothing of it. I left at about 1:30 to be at work by 2 o'clock. I arrived home about 9 o'clock. We saw it leaving as we were entering. I later heard his father calling him at 10:15 p.m.

The defense also called Melanie Robinson as witness. She testified that she knew R.M. by name and that she was "positive" that she saw him "in the pool, near the pool area" playing in the hot tub. She testified that R.M. was wearing blue Spiderman swimming shorts. Robinson also testified that she spoke with Agent Martin a few days after R.M.'s disappearance and told Martin that she had seen R.M. on the evening of July 24. On cross-examination, the prosecution showed Robinson a photo of the back of R.M.'s head that was taken after his body was recovered. Robinson testified that the hair depicted in the photo was much longer than the hair of the boy

---

[4] Both of the witnesses reported to law enforcement that they had seen R.M. on July 24. As Martin testified that she had reviewed all such reports, their reports were covered by Martin's testimony that such reports were not credible.

she had seen by the pool on the evening of July 24. In closing argument, the State theorized that Robinson had confused R.M. with another boy.

Ehrlick contends that the district court erred by allowing Martin to express her opinion, based on her expertise and investigation, that witnesses who told law enforcement that they saw R.M. on July 24 were not credible. Relying on *State v. Almaraz*, 154 Idaho 584, 301 P.3d 242 (2013), Ehrlick argues that the district court abused its discretion because this testimony invaded the province of the jury. Ehrlick further contends that the error was not harmless.

The State responds that Ehrlick's claim that the district court erred in allowing Martin's testimony fails because Martin's testimony did not assess the credibility of any witness; rather, it merely explained a stage of the investigation. The State further argues that Martin's testimony was not admitted to vouch for any witness's credibility, but to establish the thoroughness of the investigation. The State also notes that because K.D. and I.T. did not testify at trial, Martin's testimony could not have encroached on the jury's function to evaluate their credibility.

## 1. The district court abused its discretion by admitting Martin's testimony regarding the credibility of witnesses.

"Under I.R.E. 702, an expert witness may provide an opinion '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Almaraz*, 154 Idaho at 599, 301 P.3d at 257 (quoting I.R.E. 702). This Court has "routinely held that 'an expert's opinion, in a proper case, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. To venture beyond that point, however, is to usurp the jury's function.' " *Id*. at 599–600, 301 P.3d at 257–58 (quoting *State v. Perry*, 139 Idaho 520, 525, 81 P.3d 1230, 1235 (2003)); *see also State v. Hester*, 114 Idaho 688, 696, 760 P.2d 27, 35 (1988).

Although the defense called three witnesses who claimed to have seen R.M. on July 24, Martin only expressly identified one, O.J., as having made a report that was not credible. However, Martin's testimony that there were no credible reports from witnesses claiming to have seen R.M. on July 24 also called into question the credibility of each defense witness who testified to seeing him on that date. As to O.J., Martin testified:

> **[Counsel for the State]**: [D]id you look at leads that were brought in by other juveniles there, one by the name of [O.J]. and another by the name of [I.T.]?
>
> **[Martin]**: Yes, I did.

7

**[Counsel for the State]**: And were those people who had reported, potentially, seeing [R.M.] on the 24th?

**[Martin]**: Yes.

….

**[Counsel for the State]**: And did you find inconsistencies–or did you ever speak with [O.J.]?

**[Martin]**: No, I did not.

**[Counsel for the State]**: Did you ever speak with [I.T.]?

**[Martin]**: No, I did not.

….

**[Counsel for the State]**: Did you look at reports of interviews that they gave?

**[Martin]**: Yes, I did.

**[Counsel for the State]**: Did each of those individuals give multiple interviews?

**[Martin]**: Yes.

….

**[Counsel for the State]**: And did you determine whether or not either of the sightings reported–or, I'm sorry, stepping back. In reading the reviews, or the reports, did you see any inconsistent statements given by those two individuals?
….

**[Martin]**: Yes.

….

**[Counsel for the State]**: And did you determine whether or not either of them provided a credible last sighting of [R.M]?

**[Martin]**: They did not.

Martin's testimony expressly calls the credibility of O.J.'s testimony into question by asserting that, in her expert opinion, his sighting was not credible. The State, as its final question for Martin, asked: "Bottom line, after all of your efforts that you made, were you able to find what you believed to be a credible last sighting of [R.M.] there in the apartment complex on July 24, 2009?" After the district court overruled a defense objection, Martin responded, "No, I was not."

This testimony, offered by the prosecution, and permitted by the district court despite repeated objections, directly related to the credibility of witnesses and encroached on the jury function to assess witness credibility. The district court's decision to admit Martin's testimony on this subject was inconsistent with our long-standing precedent, as articulated in *Almaraz*, *Perry*, and *Hester*. As the district court's decision was inconsistent with the governing legal

8

standard, the district court abused its discretion by admitting Martin's testimony regarding the credibility of testifying witnesses. We now consider whether the district court's error was harmless.

**2. The district court's error in admitting Martin's testimony was harmless.**

The State argues that Martin's testimony regarding other witnesses' credibility could not have prejudiced Ehrlick because the jurors had ample opportunity to review their many inconsistent statements and to decide for themselves whether the witnesses were credible. Additionally, the State argues that, even without Martin's testimony, the jury would have concluded that there were no credible reports from people claiming to have seen R.M. on July 24.

Ehrlick responds that the district court's error in admitting Martin's testimony was not harmless because the State's case was entirely circumstantial and relied heavily on discrediting eyewitnesses who claimed to have seen R.M. on July 24. Ehrlick argues that, because the State's theory of the case was that R.M. was never outside on July 24 because he was either suffering from his injuries or already dead, any evidence that R.M. had been seen on July 24 was devastating to the State's case.

"In the case of an incorrect ruling regarding evidence, this Court will grant relief on appeal only if the error affects a substantial right of one of the parties." *State v. Shackelford*, 150 Idaho 355, 363, 247 P.3d 582, 590 (2010) (quoting *Obendorf v. Terra Hug Spray Co.*, 145 Idaho 892, 897, 188 P.3d 834, 839 (2008)). "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." I.C.R. 52.

> Whether an error affected substantial rights in a particular case depends upon a host of factors, including the importance of the witness' testimony to the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.

*Shackelford*, 150 Idaho at 366, 247 P.3d at 593 (citing *State v. Hooper*, 145 Idaho 139, 146, 176 P.3d 911, 918 (2007)). If a substantial right is not affected, an abuse of discretion may be deemed harmless. *Id.* at 363, 247 P.3d at 590. To establish harmless error, the State must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

9

We conclude beyond a reasonable doubt that the district court's error in admitting Martin's testimony did not contribute to the jury's verdict. The three witnesses called by the defense were thoroughly impeached. O.J.'s trial testimony was contradicted by numerous prior inconsistent statements. Hastings' testimony that she saw R.M. by the pool on the evening of July 24 was contradicted by her written statement to law enforcement that she left home for work at 1:30 p.m. and had not returned until 9:00 p.m. Robinson's claim to have seen R.M. by the pool on July 24 was likewise contradicted when she admitted under cross-examination that R.M. had longer hair than the boy she saw at the pool.

Additionally, the State had powerful circumstantial evidence that Ehrlick knew of R.M.'s death before the evening of July 24. As a form of discipline, Ehrlick would require R.M. to eat oatmeal and raisins. The remains of R.M.'s final meal, oatmeal and raisins, were found in R.M.'s stomach during the autopsy. Vomitus containing oatmeal and raisins was located by the concealed hole in the wall. Based upon the state of digestion of his stomach contents, R.M. ate less than five hours before his death. Ehrlick stated that R.M. had eaten the oatmeal for lunch, meaning that R.M. was dead before the time that Ehrlick claimed to have last seen him alive.

## B. The district court did not err in admitting the model of R.M.'s head.

The State called Wesley Neville, an FBI forensic artist as a witness. Neville testified that he created a clay model of the "approximate size and shape" of R.M.'s head. In order to create the model, Neville received three measurements of R.M.'s head taken by Robert Karinen, a forensic supervisor in the Ada County Coroner's Office: (1) the length of the face (16.8 centimeters); (2) the breadth of the face (14.5 centimeters); and, (3) the circumference of the head (53 centimeters). Neville used photographs of R.M. to "semi-accurately" place and size R.M.'s facial features on the model. After completing the clay model, Neville scanned it and, using a 3-D printer, created a plastic model of R.M's head. Karinen took measurements of the model in order to compare it to the actual size of R.M.'s head. Although the length of the face was the same, the face of the model was .7 centimeters narrower than R.M.'s face and the circumference of the head was 3.5 centimeters less than R.M.'s head. In short, the model was smaller than R.M.'s head.

At a hearing conducted to determine the admissibility of the model, the State argued that despite the "very, very minor" discrepancies in size, it was "a very fair representation of the size and shape of R.M.'s head." The State argued that the exhibit was relevant to show where R.M.

sustained injuries, the relative size and significance of R.M.'s head injuries, and to determine whether R.M.'s head created the hole found in the apartment wall. Ehrlick argued that the inaccuracies rendered the model irrelevant and unhelpful to the jury in determining the relative size of R.M.'s wounds. Ehrlick further argued that the jury should not be allowed to speculate as to whether R.M.'s head caused the hole simply by matching up two exhibits to see if they fit together. The district court admitted the model, concluding that it was sufficiently accurate to assist the trier of fact.[5]

On appeal, Ehrlick argues that the district court erred in admitting the model because it was not relevant. Ehrlick asserts that the difference in size between the exhibit and R.M.'s head is sufficiently large as to render the model irrelevant to establish: (1) the size of R.M.'s head; (2) the relative size of R.M.'s head wounds; and (3) whether the hole in the apartment wall was the same size as R.M.'s head.

> This court reviews questions of the admissibility of evidence using a mixed standard of review. Whether the evidence is relevant is a matter of law and is subject to free review. The district [court's] determination of whether the probative value of the evidence outweighs its prejudicial effect is reviewed for an abuse of discretion. This Court has adopted a three part test for determining whether the district court abused its discretion: (1) whether the court correctly perceived that the issue was one of discretion; (2) whether the court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether it reached its decision by an exercise of reason.

*State v. Stevens*, 146 Idaho 139, 143, 191 P.3d 217, 221 (2008) (internal citations omitted). "'Relevant Evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401.

1. **Ehrlick has not demonstrated the model was irrelevant to establish the location of R.M.'s head wound.**

The model was used as a demonstrative aid to show the location of R.M.'s wounds. We conclude that its minor inaccuracies did not make it irrelevant for the purpose of showing the jury where R.M. sustained a head wound.

2. **Ehrlick has not demonstrated that the model was irrelevant to establish the relative size of R.M.'s head wound.**

---

[5] The district court found that the facial features portrayed on the model were more prejudicial than probative and, as a condition of admission, required the State to cover the facial features.

11

Although the model was not precisely the same size as R.M.'s head, it was not portrayed to the jury as an exact replica. Rather, Neville informed the jury that the model was the "approximate size and shape" of R.M.'s head. In addition, the jury received testimony from Karinen that the model differed from R.M.'s head as to its circumference and the breadth of the face. Given the minor discrepancies, we are unable to conclude that the model was irrelevant to establish the relative size of R.M.'s head wounds.

### 3. Ehrlick has not demonstrated that the model was irrelevant to the cause of the hole in the apartment wall.

The prosecution offered models of R.M.'s head and the sheetrock containing the concealed hole for the purpose of establishing that Ehrlick slammed R.M.'s head into the wall, inflicting a fatal injury. The prosecution argued that it did not need an expert to testify to the mechanism of injury, but that the jury could evaluate the evidence and reach its own conclusion. Prior to admission, the prosecution represented to the district court, "Judge, I will tell the court that when you look at these items and, in particular, you match them up … it's a perfect fit." Additionally, the prosecution, in closing told the jury, "you have the head; you have the wall. You can make your own determinations as to whether the head fits into the hole, and you can do that back in deliberations."

The models were relevant to establish the State's theory of the case that the similarity of the size of R.M.'s head and the hole in the wall gave rise to an inference that the hole in the wall was caused by R.M.'s head coming in violent contact with the wall. Given the small differences in measurements and the jury's awareness of those discrepancies, we are unable to conclude that the district court abused its discretion by admitting the model.

## C. The district court did not abuse its discretion in admitting I.R.E. 404(b) evidence.

Ehrlick argues that the district court abused its discretion in admitting certain I.R.E. 404(b) evidence. First, Ehrlick argues that the district court abused its discretion in admitting testimony from three of Ehrlick's previous girlfriends because the evidence was not relevant to any issue and constituted impermissible propensity evidence. Next, Ehrlick argues that the district court abused its discretion in admitting evidence that Ehrlick attempted to contact Jenkins to influence her cooperation with law enforcement and/or her testimony. Finally, Ehrlick argues that the district court abused its discretion in allowing the State to offer evidence of his trip to the emergency room on the morning of July 31 following an attempted suicide or feigned attempt at suicide.

12

Following the presentation of evidence, the district court instructed the jury as to the limited purpose for which this evidence was admitted:

> Evidence has been introduced for the purpose of showing that the defendant committed crimes, wrongs or acts other than that for which the defendant is on trial.
>
> Such evidence, if believed, is not to be considered by you to prove the defendant's character or that the defendant has a disposition to commit crimes.
>
> Such evidence may be considered by you only for the limited purpose of proving the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or state of mind.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith." *State v. Grist*, 147 Idaho 49, 52, 205 P.3d 1185, 1188 (2009) (citing I.R.E. 404(b)). Evidence of other crimes, wrongs, or acts "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident…." I.R.E. 404(b).

> When reviewing a trial court's decision regarding the admissibility of evidence related to a defendant's prior conduct, this Court applies a two-part standard: "(1) whether, under I.R.E. 404(b), the evidence is relevant as a matter of law to an issue other than the defendant's character or criminal propensity; and (2) whether, under I.R.E. 403, the district court abused its discretion in finding the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice to the defendant."

*State v. Joy*, 155 Idaho 1, 8, 304 P.3d 276, 283 (2013) (quoting *State v. Johnson*, 148 Idaho 664, 667, 227 P.3d 918, 921 (2010)). "Evidence of a defendant's prior misconduct is not admissible unless it is relevant to the charged offense." *Id.* at 9, 304 P.3d at 284. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* (quoting I.R.E. 401). Further, in order to be relevant, evidence offered under I.R.E. 404(b) "must be sufficiently established as fact." *Id.* (quoting *State v. Pepcorn*, 152 Idaho 678, 688, 273 P.3d 1271, 1281 (2012)).

> Abuse of discretion is determined by a three part test which asks whether the district court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) reached its decision by an exercise of reason."

*State v. Field*, 144 Idaho 559, 568, 165 P.3d 273, 282 (2007) (quoting *Sun Valley Potato Growers, Inc. v. Texas Refinery Corp.*, 139 Idaho 761, 765, 86 P.3d 475, 479 (2004)).

13

**1. The district did not abuse its discretion in admitting testimony from Ehrlick's former girlfriends.**

Prior to trial, the prosecution filed a notice of intent to present I.R.E. 404(b) evidence. The prosecution sought to present testimony from three of Ehrlick's former girlfriends to demonstrate Ehrlick's "sadistic intent, intent to inflict extreme and prolonged pain, intent to inflict extreme and prolonged acts of brutality, and intent to cause suffering." Ehrlick objected to the admission of the testimony. The district court concluded that because I.R.E. 404(b) evidence is admissible to show intent, and because courts have permitted I.R.E. 404(b) evidence in murder by torture cases, the testimony of Ehrlick's prior girlfriends was admissible. Ehrlick filed a motion to reconsider, which was denied. The district court held that the testimony from Ehrlick's prior girlfriends was admissible because it was relevant to establishing Ehrlick's sadistic nature, his intent to torture, and motive. The district court also concluded that the probative value of the evidence was not outweighed by the danger of unfair prejudice to Ehrlick.

At trial, the prosecution called the three former girlfriends. The first, Misty Barnett, dated and lived with Ehrlick approximately 20 years prior to trial. Barnett testified that Ehrlick was verbally and physically violent nearly every day, that he would choke her to the point of passing out and that he would lock her in their apartment against her will. Barnett also testified that Ehrlick took pleasure in verbally and physically abusing her. The second former girlfriend, Kelly Marshall, dated and lived with Ehrlick approximately 13 years prior to trial. Marshall testified that Ehrlick was physically and mentally abusive about eighty percent of the time. Marshall testified that Ehrlick pinned her down, choked her to the point of losing consciousness, pulled her hair, spit in her face, and threw her out of their residence while she was nude. Marshall testified that Ehrlick would hold her captive in the hotel room they lived in and would only allow her to leave if he accompanied her. Marshall stated that she believed Ehrlick took pleasure in causing her physical and emotional pain and that Ehrlick never felt remorse. The third former girlfriend, Alexis Palmer, dated Ehrlick in 2004. Palmer described their relationship as emotionally and physically abusive. Palmer testified that Ehrlick was very controlling and would not let her go anywhere alone or use her phone. Palmer testified that Ehrlick would frequently choke her, pull her hair and pin her down. Palmer also testified that Ehrlick's violent outbursts were unpredictable in that there were no evident triggering events. Palmer testified that she believed Ehrlick enjoyed being mean.

14

Ehrlick argues that this evidence was not relevant because his intent was not directly at issue. Ehrlick contends that in cases where the intent required for conviction can be manifested by the circumstances attending the act, I.R.E. 404(b) evidence of intent is not relevant or admissible. Ehrlick further argues that the testimony offered by the former girlfriends failed to demonstrate that he acted with the intent to torture and thus, there is no relationship between the prior conduct and the State's charges. Finally, Ehrlick asserts that even if the testimony was relevant, the district court abused its discretion in admitting the evidence because any probative value was substantially outweighed by its prejudicial effect.

### a. The I.R.E. 404(b) testimony from Ehrlick's prior girlfriends was relevant to establish Ehrlick's intent to torture and/or his intent to satisfy a sadistic inclination.

Ehrlick was charged under I.C. § 18-4003(a), which provides "[a]ll murder which is perpetrated by means of … torture, when torture is inflicted with the intent to cause suffering … or to satisfy some sadistic inclination … is murder of the first degree." Accordingly, the State was required to prove beyond a reasonable doubt that Ehrlick tortured R.M. with: (1) the intent to cause suffering or (2) the intent to satisfy some sadistic inclination. *See State v. Tribe*, 123 Idaho 721, 724–25, 852 P.2d 87, 90–91 (1993) (recognizing that I.C. § 18-4003(a) makes the infliction of torture done with the specific intent to cause suffering or satisfy a sadistic inclination first-degree murder).

In *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985), this Court addressed a nearly identical factual and legal situation. The defendant in *Stuart* was convicted of first-degree murder by torture for beating his live-in girlfriend's three-year-old son to death *Id*. at 165, 715 P.2d at 835. At trial, the prosecution presented evidence of the defendant's prior abuse of other women and their minor children with whom the defendant had lived over a period of ten years. *Id*. at 170, 715 P.2d at 840. On appeal, we found the evidence relevant to show that the defendant had the requisite intent to torture to support a conviction under I.C. § 18-4003(a). *Id*.

Despite the many similarities between the present case and *Stuart*, there is one significant difference. In *Stuart*, the defendant placed his intent at issue by admitting to the conduct resulting in the death, but claiming he did not intend to torture the child. Specifically, Stuart argued that his "actions only constituted an overabundance of discipline, without the intent to

15

cause pain and suffering." *Id.*[6] Ultimately, this Court held that the I.R.E. 404(b) evidence "was relevant to show that [the defendant] had an intent other than that of discipline in his treatment of the victim because he treated other persons close to him in a similar manner." *Id.*

Despite the fact that Ehrlick did not place his intent at issue by admitting that he killed R.M. while disclaiming the requisite intent, the State was nevertheless required to prove that Ehrlick killed R.M. with the intent required by I.C. § 18-4003(a). *See Stuart*, 110 Idaho at 168, 715 P.2d at 838 ("In proving a murder by torture charge, the key item of proof which must be shown by the prosecution is the state of mind of the defendant."). The fact that I.C. § 18-4003(a) is a specific intent crime[7] renders Ehrlick's attempt to distinguish *Stuart* meritless because "[i]n specific intent cases, intent need not be disputed by the defendant to make evidence admissible [to prove intent under] Rule 404(b)." 22A KENNETH GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 5242 (2d ed. 2013) (citing *U.S. v. Harrod*, 856 F.2d 996, 1000 (7th Cir. 1988) ("Our analysis indicates that when the crime charged is one requiring a showing of specific intent, 'intent' need not be disputed by the defendant before Rule 404(b) evidence can be introduced. In specific-intent crimes, intent is an essential and material element to be proven, and thus necessarily becomes a matter in issue.").

Because the murder charge was for a specific intent crime, the district court correctly determined that the testimony of Ehrlick's former girlfriends was relevant to an element as to which the prosecution bore the burden of proof beyond a reasonable doubt. We now consider whether the district court abused its discretion in finding that the evidence was admissible under I.R.E. 403.

**b. The district court did not abuse its discretion in finding that the probative value of Ehrlick's former girlfriends' testimony was not substantially outweighed by the danger of unfair prejudice.**

The district court correctly recognized that it had the duty to weigh the probative value of the I.R.E. 404(b) evidence against the danger of unfair prejudice to Ehrlick. The district court recognized that the evidence was probative of Ehrlick's intent. The court noted that Ehrlick's

---

[6] Ehrlick argues that this difference makes the prosecution's introduction of I.R.E. 404(b) evidence in this case error because *Stuart* held that I.R.E. 404(b) evidence was only relevant to show Stuart's intent to torture after he placed his intent at issue.

[7] "A general criminal intent requirement is satisfied if it is shown that the defendant knowingly performed the proscribed acts, but a specific intent requirement refers to that state of mind which in part defines the crime and is an element thereof." *State v. Stiffler*, 117 Idaho 405, 406, 788 P.2d 220, 221 (1990) (citations omitted).

16

behavior such as choking, pulling hair, hitting, physically preventing movement, lack of remorse, and joy in injuring those close to him, showed that Ehrlick had an "intent to inflict suffering or to satisfy sadistic intentions." The district court stated: "Because evidence of Ehrlick's intent to inflict suffering or to satisfy sadistic intentions is highly relevant, such evidence overcomes any prejudicial effect it might have in terms of being admissible. The Court finds the probative value of this evidence is not outweighed by its danger of unfair prejudice."

The district court engaged in an extensive discussion about the relevance of the evidence, its probative value, and whether it was unduly prejudicial under I.R.E. 403. The record indicates that the district court correctly perceived the decision as discretionary, acted within the boundaries of its discretion, and reached its decision through the exercise of reason. Accordingly, we conclude that the district court did not abuse its discretion by admitting the testimony of Ehrlick's former girlfriends.

### 2. The district court did not err in admitting evidence that Ehrlick attempted to contact Jenkins pursuant to I.R.E. 404(b).

On August 2, 2010, the prosecution filed a motion in limine and notice of its intent to present evidence, pursuant to I.R.E. 404(b), of two separate instances where Ehrlick attempted to influence, affect, or alter Jenkins' testimony. The first instance occurred after Jenkins made statements in an interview with law enforcement officers regarding Ehrlick's physical abuse of R.M. Officers then confronted Ehrlick with Jenkins' statements. Ehrlick then attempted to contact Jenkins by phone, albeit unsuccessfully. Ehrlick left seven voice messages for Jenkins between July 30 and 31, 2009. The messages are as follows:

1. **Thursday, July 30, 1:45 PM**: Melissa, this is Danny you need to call me back as soon as you can. Bye.

2. **Thursday, July 30, 3:08 PM**: Melissa, this is Danny. Dude, you better call me as soon as possible. Thank you.

3. **Thursday, July 30, 6:46 PM**: Hi, Honey. This is Danny. I love you, baby. I don't know what's going on. Please call me as soon as you can. If not I'm going to keep trying to call you. Thank you.

4. **Thursday, July 30, 8:00 PM**: Melissa, why did you do this to me? Why? All I want to know, why did you do this to me?

5. **Thursday, July 30, 9:52 PM**: All I can say is I love you, Melissa. I do. I love you. And I'm sorry that you've done this. I didn't ever think you would do this to me, Melissa. I didn't but I guarantee you, Melissa, I never did anything to poor [R.M.]. (Inaudible) And I'm sorry you lost trust in me but I'm telling you I never did anything to harm [R.M.]. I'm sorry, babe. I love you.

17

6. **Thursday, July 30, 11:40 PM**: Hi Melissa. It's Danny. Sorry for everything. I would really like to talk and if (inaudible) you understand that I love you.

7. **Friday, July 31, 4:41 PM**: Melissa, this is Danny. You need to call me as soon as possible.

These messages were played in open court and published to the jury.

The second instance followed the State notifying Ehrlick that Jenkins might be called to testify against him at trial. Two weeks later, Ehrlick contacted his cousin, Robyn Ehrlick, and asked her to forward a letter he authored to Jenkins. The letter provided:

> Hello! I am writting to ask why? Why are you such a liar? Why are you lieing about me? Why all the BullShit?
>
> I have never been so hurt in all my life I am so Deviastated I will never be the same… I have lost a apart of my Heart and soal I will never get back.
>
> I have lost my will to care… There is no hope in sight. I have lost my will to live… all that I have loved and cared for have been taken from me.. This really sadens to write this? So please bear with me… It really go's to show me how much you really cared…
>
> I know it, You Know it, Everybody also know's it, the only Thing I cared about was the Kid's… That's why this hurt's me so much… I was never abusive to the Kid's or to Melissa. –Never- (why all the lies)
>
> All I wanted more than anything was for the Kids to have a life to have a good life. And that life was with me… Not Just for Them, for me Too…
>
> It really sad you believed all the BullShit and all the Lies the cops fed you.. When you Know Better.. I Did nothing wrong..
>
> I also want to Thank-you for all the Property of mine that you and your family stoled from me… That show's me even more … Just so you are aware of it.. Thank's I knew I should have got out sooner. It goes to show I was wright the whole time…
>
> Well I am going to let you go.. Thanks for everything.. Make sure To Thank yor family as well… If you Don't Know By now – They are also stabbing you in the Back – Your Sister most of all…

(Errors in original).

The prosecution argued that Ehrlick's efforts to contact Jenkins were an attempt to influence the testimony of a potential witness and reflected Ehrlick's consciousness of guilt. Ehrlick opposed the motion. The district court granted the State's motion, stating:

> Even though Ehrlick does not make an explicit attempt to influence Jenkins, the court finds that in the context in which the State intends to offer it, it can be construed as an attempt to influence a witness, which is admissible 404(b) evidence to show consciousness of guilt …. The court finds this evidence is highly relevant and it is not unduly prejudicial. The evidence can also be interpreted to be that of an innocent man trying to clear himself. The court grants the motion.

18

Ehrlick argues that the evidence was not relevant because it does not demonstrate a consciousness of guilt; rather, the most obvious interpretation of the evidence shows an innocent man trying to clear himself. Ehrlick further argues that even if the evidence was relevant, it was not admissible under I.R.E. 403 because its probative value is substantially outweighed by its prejudicial effect. Ehrlick asserts that the evidence was prejudicial because it portrays him "in an unfavorable light, showing a personality and style that is inherently unlikeable."

### a. The evidence of Ehrlick's attempts to contact Jenkins was relevant to the purpose of demonstrating consciousness of guilt.

"I.R.E. 404(b) allows evidence of other acts if admitted for the purpose of showing … consciousness of guilt." *State v. Sheahan*, 139 Idaho 267, 279, 77 P.3d 956, 968 (2003). "[E]vidence which tends to show that the accused has attempted to fabricate or procure false evidence is admissible as showing a consciousness of guilt." *State v. Rolfe*, 92 Idaho 467, 470, 444 P.2d 428, 431 (1968); *see also State v. Pokorney*, 149 Idaho 459, 463, 235 P.3d 409, 413 (Ct. App. 2010) ("Evidence of a defendant's efforts to influence or affect evidence, such as intimidating a witness, offering to compensate a witness, and fabrication, destruction or concealment of evidence may be relevant to demonstrate consciousness of guilt."). Such evidence is admissible because a defendant's effort to influence evidence suggests an attempt to evade justice, and hence, implicates consciousness of guilt. *Pokorney*, 149 Idaho at 463–64, 235 P.3d at 413–14. When evidence that is offered to establish consciousness of guilt also supports non-inculpatory inferences, this goes to the weight, not the relevance of the evidence. *Sheahan*, 139 Idaho at 279, 77 P.3d at 968.

The evidence of Ehrlick's attempts to contact Jenkins is relevant to establish consciousness of guilt because it supports a reasonable inference that Ehrlick was seeking to influence Jenkins' testimony and/or her cooperation with law enforcement, although none of the evidence presented by the prosecution involved a direct threat to Jenkins or an express request that she not cooperate. In this way, the facts of this case are similar to the facts in *Pokorney*.

In *Pokorney*, the defendant was charged with seven counts of lewd conduct with a minor based upon allegations by four of his five sons. 149 Idaho at 461, 235 P.3d at 411. Prior to trial, the State notified the defendant that it intended to introduce a letter written by the defendant to his eldest son while in jail. *Id*. In the letter, the defendant denied the allegations made against him and attempted to explain a previous conviction for sexual abuse of a child. *Id*. The State argued that the letter was admissible under I.R.E. 404(b) because it was relevant to show that the

19

defendant was manipulating his son, a potential witness or accuser, which demonstrated consciousness of guilt. *Id*. at 463, 235 P.3d at 413. Although the letter did not contain an explicit request that the son change his testimony or attempt to influence that of his siblings, the Court of Appeals concluded that a fair interpretation of the letter was as an attempt to persuade the eldest son to provide helpful testimony and, arguably, for him to convince his younger siblings not to testify. *Id.* at 465, 235 P.3d at 415. Despite the existence of alternative reasonable, non-inculpating inferences that might be drawn, the letter was admissible because it had some tendency to establish the defendant's consciousness of guilt.

As with the letter in *Pokorney*, Ehrlick's attempts to contact Jenkins can fairly be interpreted as an attempt to persuade her not to cooperate or to provide false testimony. Both instances of attempted contact followed closely on the heels of Ehrlick learning that Jenkins had either implicated Ehrlick in R.M.'s death or planned to do so. The choice of words and tone of the attempted contacts can easily be interpreted as an effort by Ehrlick to appeal to Jenkins' sympathy or an attempt to cause her to regret her cooperation due to the impact on him and their relationship. Undoubtedly, as the district court pointed out, the attempted contact may be viewed as an innocent man trying to clear his name. However, the existence of an alternative inference affects the weight, not the relevance, of the evidence. *Sheahan*, 139 Idaho at 279, 77 P.3d at 968. We next consider whether the district court abused its discretion in finding that the evidence was admissible under I.R.E. 403.

> **b. The district court did not abuse its discretion in finding that the probative value of Ehrlick's attempts to contact Jenkins was not outweighed by the danger of unfair prejudice.**

In its written decision on the State's motion in limine, the district court explicitly recognized that the determination whether the probative value of evidence was substantially outweighed by the danger of unfair prejudice was committed to its discretion. The district court acted within the bounds of its discretion and consistently with the appropriate legal standards. This is evident from the district court's citation to, and proper interpretation of, relevant case law including *Rolfe* and *Pokorney*. Finally, the district court reached its decision by an exercise of reason, established by the district court's clear weighing of the probative value versus the unfair prejudice. Accordingly, we hold that the district court did not abuse its discretion in admitting the evidence of Ehrlick's attempted contact with Jenkins.

**3. The district court did not err in admitting evidence that Ehrlick visited the emergency room after an attempted suicide or a feigned suicide attempt.**

On July 30, 2009, law enforcement officers began to formally question Ehrlick about his role in the disappearance of R.M. At this time, Ehrlick had not been arrested and had not been provided *Miranda* warnings. At the conclusion of the July 30 interview, Ehrlick told law enforcement officers that he would return the next morning and "tell [them] the truth" or "tell [them] what happened." The morning of July 31, around the time investigators expected Ehrlick to arrive for further questioning, they received a call from Jenkins' sister, Tricia, with whom Ehrlick had been staying. Tricia informed them that she believed Ehrlick had overdosed on sleeping pills. Tricia believed that Ehrlick had overdosed because, when she tried to awaken him to take him to the police station, he was extremely somnolent and difficult to rouse. Tricia noticed that Ehrlick's bottle of sleeping pills, which was "at least a quarter or so full" the night before, was empty. Tricia was instructed to bring Ehrlick to the police station where they would have an ambulance waiting. From there, Ehrlick was transported to the emergency room at St. Alphonsus Regional Medical Center.

There, doctors monitored Ehrlick, ran diagnostic tests, and determined that Ehrlick was medically clear. The attending physician charted that Ehrlick "was quite reluctant, seemingly selectively to answer some of my questions, while all other questions, he would answer and then became quite annoyed and agitated then yelling obscenities, cussing and cursing, calling us names." After speaking with Tricia, the physician had concerns that Ehrlick had ingested a large amount of benzodiazepine. Ehrlick denied any suicidal intentions. After a couple of hours at the hospital, Ehrlick became much more alert. Officers remained with Ehrlick in the hospital room. They witnessed Ehrlick place a phone call in which he became extremely emotional, threw the phone, and began crying. Following this outburst, Ehrlick was admitted to Intermountain Hospital and placed on a twenty-four hour mental hold.

The prosecution filed a motion in limine seeking to present evidence of Ehrlick's July 31, 2009, emergency room visit. A hearing was held to address the motion. In its written decision on the motion, the district court concluded that:

> The jury could reasonably find by a preponderance of evidence that Ehrlick attempted suicide and that this attempt was a diversionary tactic used by Ehrlick to draw attention away from him and to slow or thwart police investigation as well as creating additional delays in the reporting of the death of [R.M.]. The evidence is relevant to Ehrlick's state of mind and intent.

21

The district court also concluded that the danger of unfair prejudice in admitting the evidence did not substantially outweigh its probative value.

Ehrlick contends that the district court erred by permitting the State to present evidence of his July 31 hospital visit. Ehrlick argues that there was no evidence before the district court that he attempted or feigned an attempt to commit suicide; thus, the district court's finding that Ehrlick attempted suicide is clearly erroneous. Ehrlick asserts that because there was not sufficient evidence to establish the alleged conduct, the evidence presented was not relevant. Ehrlick insists that the evidence only proves that Jenkins' sister believed he may have attempted suicide. Ehrlick further argues that if the evidence is found to be relevant, its probative value is outweighed by the prejudicial effect because it tends to show that Ehrlick has a substance abuse problem. Finally, Ehrlick argues that the admission of this evidence violated his Fifth Amendment privilege against self-incrimination as a comment on his silence.

The State responds that the evidence presented established that Ehrlick spent the night trying to call Jenkins, leaving six voice messages, drinking heavily, and either took or faked taking eighty Lorazepam pills. This evidence, the State argues, supports the inference that Ehrlick made either a genuine or feigned attempt to take his life in order to manipulate Jenkins or otherwise interfere with the police investigation.

### a. A reasonable jury could conclude that Ehrlick either attempted suicide or feigned an attempt at suicide.

"Before considering whether prior uncharged conduct is admissible under I.R.E. 404(b), the Court must also confirm that a reasonable jury could believe that the conduct actually occurred." *State v. Johnson*, 148 Idaho 664, 667 n.2, 227 P.3d 918, 921 n.2 (2010). In this case, a reasonable jury could conclude that Ehrlick either attempted suicide or feigned an attempt at suicide. This conclusion is reasonable based on Ehrlick's condition the morning of July 31 and the testimony of Jenkins' sister that Ehrlick's pill bottle went overnight from being a least a quarter full to empty. Additional evidence showed that for Ehrlick's pill bottle to be empty on the morning of July 31, he would have had to have ingested eighty-two Lorazepam tablets or intentionally disposed of them in some other manner.

### b. The evidence of Ehrlick's attempt or feigned attempt to commit suicide was relevant to establish consciousness of guilt.

Behavior indicative of a consciousness of guilt encompasses a wide range of acts, including attempted or feigned attempted suicide. 29 Am. Jur. 2d *Evidence* § 318 (2014). More

22

specifically, "[e]vidence of attempted suicide by a person who is, at the time of the attempt or thereafter, charged with or suspected of a crime, is relevant as possibly indicating consciousness of guilt and admissible at trial for that crime for whatever weight the jury chooses to assign." *Id*. § 547; *see also State v. Hargraves*, 62 Idaho 8, 20, 107 P.2d 854, 859 (1940) (evidence that defendant obtained a shaving brush concealing a bullet and four grains of morphine from outside of the jail was properly introduced for the purpose of establishing an attempt upon the part of appellant to commit suicide because it showed a consciousness of guilt); *State v. Mitchell*, 450 N.W.2d 828 (Iowa 1990) (evidence of attempted suicide admissible to show consciousness of guilt where suspect attempted suicide in back of squad car en route to jail when suspect was aware of potential kidnapping charges).

In this case, evidence of Ehrlick's visit to the hospital and attempt or feigned attempt to commit suicide was relevant to establish consciousness of guilt because the evidence, when viewed in the context of the police interview the preceding day, had a tendency to establish that Ehrlick was seeking to delay or avoid contact with law enforcement.

### c. The district court did not abuse its discretion in finding that the probative value of Ehrlick's attempted or feigned attempted suicide was not outweighed by the danger of unfair prejudice.

The district court explicitly recognized that this decision was committed to its discretion. The district court acted within the bounds of its discretion and consistently with the applicable legal standards. This is evident from the district court's citation and proper interpretation of relevant case law including *Sheahan*, *Pokorney*, *Rossignol*, *Grist* and *Huddelston v. United States*, 485 U.S. 681 (1988). The district court reached its decision by an exercise of reason, as established by the court's clear articulation of its finding that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The district court did not abuse its discretion.

### d. Admission of evidence that Ehrlick attempted or feigned an attempted suicide did not violate his Fifth Amendment right against self-incrimination.

Ehrlick argued to the district court that admission of evidence that he attempted or feigned an attempt at suicide would violate his Fifth Amendment right to remain silent. The district court wrote:

> The constitutional right against self-incrimination applies when silence is used solely for the purpose of implying guilt. *State v. Moore*, 131 Idaho 814, 821, 965 P.2d 174 (1998). In *Moore*, the state was allowed to present evidence that

23

defendant fled the jurisdiction when he became aware of an investigation into alleged sexual abuse involving him as the suspect. On appeal he argued that this evidence violated his constitutional right to remain silent. The court stated that because "the evidence was probative on the issue of flight and was admitted for that purpose and not directly as an admission of guilt, we hold that the district court did not err in admitting the testimony." The primary purpose of the evidence is to show Ehrlick's attempted suicide. The evidence goes to his state of mind …. The purpose is not to directly show an admission of guilt of his involvement in the murder.

"Whether the admission of evidence violates a defendant's right to remain silent is a constitutional question which this Court reviews de novo." *Moore*, 131 Idaho at 820, 965 P.2d at 180 (citing *Harris v. State Dep't of Health & Welfare*, 123 Idaho 295, 847 P.2d 1156 (1992)). "[D]efendants' Fifth Amendment right not to have their silence used against them in a court proceeding is applicable pre-arrest and pre-*Miranda* warnings." *Id*. "The constitutional right against self-incrimination is not absolute, however, and applies only when the silence is used solely for the purpose of implying guilt." *Id*. at 821, 965 P.2d at 181.

Here, as in *Moore*, the evidence of Ehrlick's attempted or feigned attempted suicide and subsequent hospital visit was offered as probative evidence of a consciousness of guilt and not as a comment on the invocation of the privilege to remain silent to directly imply an admission of guilt. *Id*. Accordingly, we conclude that the admission of this evidence did not violate Ehrlick's Fifth Amendment privilege against self-incrimination.

**D. The admission of the testimony of Samantha Burnett was not reversible error.**

The prosecution called Samantha Burnett during its case in chief. Burnett and her three children, ages seven, nine, and eleven, had resided at the apartment complex for six months when R.M. disappeared. Burnett testified that in the summer of 2009 she accompanied her children to the apartment complex's community pool and playground area every day; this included the evening of July 24 between the hours of 8:00 p.m. and 10:00 p.m. Burnett testified that as she was returning to her apartment from the pool she saw and heard Jenkins screaming for R.M., learned that he was missing, and joined the search for R.M. Burnett's search efforts entailed walking around the apartment complex, calling R.M.'s name, and asking people she encountered if they knew anything about R.M.'s whereabouts. Burnett helped search for R.M. until 2:00 a.m. During direct examination, the prosecution questioned her as to whether a birthday party took place at the apartment complex on July 24:

24

**[Counsel for the State]:** Now [while searching], did you hear any talk about a birthday party?

**[Burnett]:** Yes, that was the first story that I had heard.

**[Counsel for the State]**: And what in particular had you heard?

**[Burnett]:** I heard that [R.M.] was going to a birthday party and they weren't sure which apartment it was in, but that he was going there and that's when he disappeared.

**[Counsel for the State]:** And during the time that you were searching that night, did you see any signs of a birthday party?

**[Burnett]:** No.

….

**[Counsel for the State]:** And during that night when you were search [sic], did you talk to children who were out?

**[Burnett]:** Yes.

….

**[Counsel for the State]:** Do you have any idea how many kids that you went and talked to that night?

**[Burnett]:** At least 15 or 20.

**[Counsel for the State]:** And during the time that you were out searching, did you come across anybody who knew anything about a birthday party?

**[Defense Counsel]:** Objection. Hearsay….

….

**The Court:** The objection's overruled.

**[Counsel for the State]:** Ma'am while you were out searching, did you find anybody who knew anything about a birthday?

**[Burnett]:** No.

**[Counsel for the State]:** At the time that you heard this, did you personally question the birthday story?

**[Burnett]:** Yes.

**[Defense Counsel]:** Objection. Lack of relevance.

**The Court:** The objection's overruled.

Ehrlick argues that although the prosecution did not ask Burnett to reveal any particular statement made by any particular declarant, Burnett's testimony constituted hearsay. Ehrlick contends that the children providing Burnett with information as to the existence or non-existence of a birthday party were making assertions which were then offered to prove the truth

of the matter asserted. Ehrlick argues that because the statements were hearsay and the prosecution did not identify an exception to the hearsay rules, the district court abused its discretion by allowing Burnett to testify that she did not find anyone who knew anything about a birthday party.

1. **Burnett's testimony that none of the children she talked to were aware of a birthday party was inadmissible hearsay.**

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." I.R.E. 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." I.R.E. 801(a). Thus, there are three essential components of hearsay evidence: (1) a statement or assertive conduct; (2) made out of court, other than by a witness testifying at the current trial; that is (3) offered to prove the truth of the matter asserted. I.R.E. 801(a), (c). If these elements are not satisfied, the evidence is not hearsay. *Id*. "Hearsay is not admissible unless specifically provided for in the Rules of Evidence." *State v. Joy*, 155 Idaho 1, 13, 304 P.3d 276, 288 (2013) (citing I.R.E. 802).

Burnett's testimony that none of the children she spoke to were aware of a birthday party was hearsay. Although Burnett did not specifically recount the precise details of her conversations with the children, she conveyed the substance of their reports. The children's responses to her question were oral assertions that the children were not aware of a birthday party. The assertions were made out of court by people other than Burnett. They were offered for the purpose of proving the truth of the assertions, i.e., that children living in the apartment complex were not aware of a birthday party. Thus, Burnett's testimony as to the children's lack of awareness of a birthday party was hearsay.[8] As the State has not identified a relevant exception to the hearsay rule, the district court erred by admitting this testimony. I.R.E. 802.

2. **The admission of Burnett's testimony as to the information she received from the children was harmless error.**

As previously discussed, the State must prove "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Five other witnesses testified that they spoke with children about their awareness of a birthday party. David

---

[8] We note the State's inconsistent positions as to the hearsay nature of children's reports as to awareness of a birthday party. In part IV(E) of this opinion, *infra*, the State correctly contends that a statement by a child to a police officer regarding talk of a birthday party was inadmissible hearsay.

Ehrlick, the defendant's younger brother, testified that he spoke with "20 or more" children and an unspecified number of adults at the complex on the evening of R.M.'s disappearance and none of them knew anything about a party. Officer Guy McKean testified that he and another officer went door-to-door in the complex in a search for R.M. and that no one had heard of a birthday party. Pamela Duncan testified that she had asked children about a birthday party and none had heard anything about one. Officer Deidre Hart testified that during the course of her search, she did not come across anyone with knowledge of a birthday party. Perhaps the most extensive testimony came from Pamela Anderson, who testified that she spoke with children in the neighborhood on the night of July 24 and "nobody knew anything about a birthday party." Based upon the children's reports, Anderson explained that she thought that Ehrlick's "story" about a birthday party was "a diversion," a conclusion she reached "because the children in that complex know everything that goes on around there. I mean, somebody would—someone else would had to have known about a birthday party."

In view of the voluminous testimony presented by other witnesses that children in the complex were unaware of a birthday party–evidence that is not challenged in this appeal–we conclude that the erroneous introduction of Burnett's testimony did not contribute to the verdict obtained.

**3. Burnett's lay opinion testimony was admissible under I.R.E. 701.**

Ehrlick also argues that the district court erred in admitting lay opinion testimony from Burnett because it was inadmissible under I.R.E. 701. Ehrlick points to the following portion of Burnett's testimony:

> **[Counsel for the State]**: At the time that you heard this, did you personally question the birthday story?
>
> **[Burnett]**: Yes.
>
> **[Defense Counsel]**: Objection. Lack of relevance.
>
> **The Court**: The objection's overruled.
>
> **[Counsel for the State]**: Why?
>
> **[Defense Counsel]**: Again, I object to this as her impressions are irrelevant…. The impression of noninterested people, 200 people that live in the 200 apartments there, begs the jury to speculate.
>
> **[Counsel for the State]**: Judge, I don't think it's asking her to speculate about anything. We're simply asking her about her impression as to the story that the child was going to a birthday party and disappeared.

27

**The Court**: Based on her living in the apartment complex?

**[Counsel for the State]**: Yes.

….

**The Court**: … [T]he objection is overruled.

….

**[Counsel for the State]**: Ms. Burnett … Based on the information that you received that night, did the story that you were hearing about the child going to a birthday party make sense to you?

**[Burnett]**: No, it did not.

**[Counsel for the State]**: Why not?

**[Burnett]**: It was 10 o'clock at night. There were no signs of a birthday party….

Ehrlick argues that the district court erred by allowing Burnett to testify that her opinion was that the birthday party story did not make sense. Ehrlick asserts that the district court erred because Burnett's testimony was not helpful to the jury and amounted to an inadmissible comment on Ehrlick's credibility.

> The Idaho Rules of Evidence provide that a lay witness may give testimony containing an opinion or inference if the testimony is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge...." I.R.E. 701. This Court has held that the "perception of the witness" requirement in Rule 701(a) requires opinions and inferences to be based upon "the witness's personal knowledge of events or facts...." *State v. Raudebaugh*, 124 Idaho 758, 767, 864 P.2d 596, 605 (1993). This requires "the same personal knowledge of events as required by I.R.E. 602," which provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." *Id.* (quoting I.R.E. 602). Thus, a lay witness may give an opinion or inference if doing so helps to explain the witness's testimony or to determine a disputed fact and the opinion or inference is based upon the witness's personal knowledge as demonstrated by evidence.

*Joy*, 155 Idaho at 16, 304 P.3d at 291.

> The decision to admit opinion testimony, whether lay opinion or expert opinion, rests within the discretion of the lower court, while the determination of its weight lies with the jury. *State v. Cutler*, 94 Idaho 295, 299, 486 P.2d 1008, [1012] (1971). "The trial court's broad discretion in admitting evidence 'will only be disturbed on appeal when there has been a clear abuse of discretion.' " *State v. Merwin*, 131 Idaho 642, 646, 962 P.2d 1026, 1030 (1998) (quoting *Walker v. Am. Cyanamid Co.*, 130 Idaho 824, 832, 948 P.2d 1123, 1131 (1997)).

*State v. Almaraz*, 154 Idaho 584, 602, 301 P.3d 242, 260 (2013).

Burnett's testimony was rationally based on her own perceptions, it was helpful to the jury, and the basis for the opinion did not rely on scientific, technical or other specialized knowledge. Burnett's testimony established that she had personal knowledge of the matter on which she was rendering an opinion. She testified that she had lived in the apartment complex with her three children for six months and had spent all day, every day, of the summer in the complex's community areas and had a strong familiarity with the social norms of the community. We conclude that the district court did not abuse its discretion in allowing Burnett to give lay opinion testimony.

**E. The district court did not err in holding that out of court statements made by a juvenile to Detective Brechwald were inadmissible hearsay statements.**

The State called Boise City detective, Matthew Brechwald, as a witness. In July and August of 2009, Brechwald was assigned to the department's Special Victims Unit and participated as a liaison officer[9] in the search for R.M. As a liaison officer, Brechwald also collected evidence when circumstances permitted. The issue on appeal regarding Brechwald's testimony arose during cross-examination:

> **[Defense Counsel]**: In particular, did you have contact with a lady who lived upstairs named Carol Carillo?
>
> **[Brechwald]**: I did.
>
> **[Defense Counsel]**: And after talking with her you actually talked to her son, [D.T.], did you not?
>
> **[Brechwald]**: I believe I did, but to be specific I would need to refresh my memory.
>
> **[Defense Counsel]**: And do you recall [D.T.], young [D.T.], telling you that he had seen [R.M.] with a child –
>
> **[Counsel for the State]**: Objection.
>
> **The Court**: Pardon?
>
> **[Counsel for the State]**: Counsel is presenting hearsay as he's testifying.

Outside the presence of the jury, defense counsel responded to the State's hearsay objection with the following offer of proof:

> Again, I think the offer of proof that I would make, in a very generic sense, is that this [D.T.] is asked if he had ever played with [R.M.], and he said he had played with [R.M.] it is kind of unclear when. But certainly the impression that is left is

---

[9] Aa a liaison officer, Brechwald was assigned to Ehrlick and Jenkins to act as an intermediary between law enforcement and R.M.'s family. Brechwald spent many hours with Ehrlick and Jenkins in this capacity.

that it was very soon in time to the time he came missing. The same thing–the same argument is going to apply to *[K.D.]* as well, in that when he talks to her, or *when she talks to law enforcement*, she says she played with [R.M.] on the swing, then she was at the hot tub or pool area with her family members and doesn't say that he was in the pool, but *says that there was talk of a birthday party*.

Defense counsel argued for the admission of D.T. and K.D.'s statements, observing that the State "repeatedly said that [Ehrlick's] statements about [R.M.'s] location and his activities on the 24th were false, and there are other people who said that they had seen [R.M.] on the 24th, which certainly impeaches or rebuts that inference." Further, defense counsel argued that K.D.'s statement should be admitted because it was not offered for the truth of the matter, but to explain why Ehrlick told law enforcement that R.M. was at a birthday party. The district court sustained the objection, finding that the testimony would confuse the jury and that the statements were hearsay.

Ehrlick argues that the district court abused its discretion in sustaining the State's objection to Brechwald testifying that K.D. told him that there was talk of a birthday party. Ehrlick contends that the statement would not have been hearsay because it was not offered for the truth. Instead, Ehrlick asserts that the evidence was offered to demonstrate that he was not the only person who spoke about a birthday party. Ehrlick argues that the testimony would not have confused the jury if the district court would have merely instructed the jury that the evidence was not to be considered for its truth.

As previously noted, hearsay is: (1) a statement or assertive conduct; (2) made out of court, other than by a witness testifying at the current trial; that is (3) offered to prove the truth of the matter asserted. Here, the defense sought to elicit Brechwald's testimony that K.D. told him of "talk of a birthday party." This was clearly an out-of-court statement made by someone other than Brechwald. Although Ehrlick asserts otherwise, the testimony was clearly offered for the purpose of establishing the truth of the assertion, i.e., that there was "talk of a birthday party." It was therefore hearsay. Ehrlick does not contend that the proposed testimony was admissible under an exception to the hearsay rules. Thus, for the same reasons that we have concluded that the district court erred in admitting the testimony of Samantha Burnett regarding the reports she received from children, the district court did not err by excluding this testimony.

**F. The district court erred by permitting the State to question Ehrlick about an agreement and custody order to which he was not a party; however, the error was harmless.**

30

On direct examination, Ehrlick testified that in the summer of 2008, while Jenkins was at work from 7:00 a.m. to 3:00 p.m., he was the primary caregiver for R.M., R.A., and A.E., Jenkins' three children. Ehrlick also testified that, in the spring of 2008, he was at home "every day" taking care of R.A. and A.E., which consumed nearly all of his time. On cross-examination, the prosecutor asked Ehrlick:

> **[Counsel for the State]**: Isn't it true that in January of 2008, Rusty [Aimes], [R.A.'s] father, filed a petition with the court saying that [R.A.] was in an unsafe and unsatisfactory environment while Melissa was living with you?
>
> **[Ehrlick]**: I don't know.
>
> **[Counsel for the State]**: Isn't it true that, as part of the agreement for temporary custody–
>
> **[Defense Counsel]**: Objection, Your Honor. I don't believe that this has been covered by any previous–
>
> **[Counsel for the State]**: I think this is proper cross-examination. It goes to the credibility of this witness, Judge.
>
> **The Court**: The objection is overruled.
>
> **[Counsel for the State]**: Isn't it true that Melissa Jenkins agreed that you would not have contact with R.A. as part of the temporary custody order while she was fighting with Rusty Aimes in court over custody of [R.A.]?
>
> **[Ehrlick]**: I don't know that.
>
> **[Counsel for the State]**: And isn't it true that Rusty Aimes specifically said he didn't want Melissa – or didn't want [R.A.] –
>
> **[Defense Counsel]**: Objection. Hearsay. Lack of foundation.

The district court removed the jury to receive argument on the objection. The prosecutor argued that Ehrlick put his credibility at issue when he decided to testify and the questions related to Ehrlick's testimony that "he watched [R.A.] and took care of two toddlers and was with them all the time." Defense counsel responded that the agreement and custody order did not demonstrate that Ehrlick did not actually watch R.A., that the door was not opened to its admission, and that it was unfairly prejudicial.

The district court overruled the objection. After the jury returned, the State began to question Ehrlick about the custody order:

> **[Counsel for the State]**: Mr. Ehrlick … we were talking about [R.A.], and you had said earlier that you baby-sat her all the time during the spring of 2008. Do you recall that?
>
> **[Ehrlick]**: Yes.

31

**[Counsel for the State]**: In fact, that wasn't supposed to be going on, correct?

**[Ehrlick]**: I don't know anything about that.

**[Counsel for the State]**: Can I have the witness handed what's been marked as State's 110.

(Marshal complied.)

Mr. Ehrlick you've been handed a certified copy of a temporary custody order involving [R.A.], Melissa Jenkins' daughter; do you see that?

**[Ehrlick]**: Yes, I do.

….

**[Counsel for the State]**: Can you read me what it says on line 2 on page 2?

**[Defense Counsel]**: I'll object to that again as being irrelevant to the issues in this case.

**[Counsel for the State]**: The same issue we discussed yesterday, Judge. It's a credibility issue.

**The Court**: Okay. Well, based on relevancy, the objection's overruled.

**[Counsel for the State]**: Can you read that line, please, sir?

**[Ehrlick]**: It says, "Neither party shall leave the party's [sic] minor child alone with Danny Ehrlick."

….

**[Counsel for the State]**: Move to admit State's 110.

**[Defense Counsel]**: Again, objection. Lack of foundation. Lack of relevance. Hearsay objection.

….

**The Court**: Okay, Exhibit 110 is admitted.

During a break in the testimony and outside the presence of the jury, the district court revisited its decision to admit State's Exhibit 110. The district court expressed its concern as to the lack of evidence that Ehrlick was aware of the agreement and order as well as the lack of evidence, if any, upon which the order was entered. The district court then reversed its earlier order admitting the exhibit and deemed it withdrawn.

Ehrlick argues that the district court erred by permitting the State's questioning on this subject because the evidence was irrelevant. Alternatively, Ehrlick contends that even if the evidence was relevant, the probative value was outweighed by prejudice. The State responds that the existence of the order had some tendency to impeach Ehrlick's testimony that he was R.A.'s primary caregiver.

32

> Whether evidence is relevant is an issue of law. The trial court has broad discretion in the admission of evidence, and its judgment will only be reversed when there has been an abuse of that discretion. Thus, the inquiry is two-fold; we must first freely review and determine whether the proffered evidence is relevant, and secondly we evaluate whether the district court abused its discretion in determining whether the probative value was outweighed by unfair prejudice.

*State v. Meister*, 148 Idaho 236, 239, 220 P.3d 1055, 1058 (2009) (internal quotations and citations omitted). "[A]ll relevant evidence is admissible, unless otherwise provided by the Idaho Rules of Evidence or other rules for the courts of Idaho." *Id*. at 240, 220 P.3d at 1059 (citing I.R.E. 402). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401. Evidence relating to the credibility of a witness is always relevant. *Mulford v. Union Pac. R.R.*, 156 Idaho 134, 141, 321 P.3d 684, 691 (2014). However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. (quoting I.R.E. 403).

In the absence of any evidence that Ehrlick was aware of Jenkins' agreement relating to R.A.'s custody or the resulting order, this evidence was not relevant to Ehrlick's credibility. The bare facts of the existence of the agreement and order do not, in themselves, tend to demonstrate the falsity of Ehrlick's claim to have cared for the children. The district court erred by permitting the State's questions, which error the district court evidently recognized when it withdrew State's Exhibit 110 from evidence. Thus, the corollary issue that we must decide is whether the district court's error was harmless.

To establish harmless error, the State must "prove 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *State v. Perry*, 150 Idaho 209, 221, 245 P.3d 961, 973 (2010) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). We conclude that the district court's error did not contribute to the verdict obtained. We first observe that the brief testimony regarding the custody agreement occurred during the course of a trial lasting seven weeks. In addition to the compelling evidence that Ehrlick was aware of R.M.'s death prior to reporting him missing on July 24, discussed earlier in section IV(A) of this opinion, there was other compelling evidence linking Ehrlick to R.M.'s murder, despite Ehrlick's

33

denial of responsibility.[10] Vomited matter containing oatmeal and raisins was found next to the hole in the wall. Oatmeal and raisins was a meal that Ehrlick forced R.M. to eat as a form of discipline. Further, evidence was presented that R.M.'s inevitably-fatal abdominal injury was accompanied by bruising consistent with Ehrlick's admission that he placed his knees on R.M.'s abdomen. Ehrlick weighed more than 275 pounds. We conclude that the error in admitting and questioning Ehrlick regarding the custody agreement was harmless.

## G. Prosecutorial Misconduct.

Ehrlick argues that the prosecution committed four acts of prosecutorial misconduct during closing argument which deprived him of his right to a fair trial. However, Ehrlick only contemporaneously objected to one of these alleged acts of misconduct. Ehrlick argues that each act of misconduct not followed by a contemporaneous objection constitutes fundamental error, and that none of the acts of misconduct are harmless.

This Court's analysis of claims of prosecutorial misconduct is determined by the presence or absence of a contemporaneous objection to the alleged misconduct. For alleged acts of prosecutorial misconduct resulting in a contemporaneous objection, this Court engages in a two-step analysis–first asking whether misconduct occurred and, if so, whether the misconduct was harmless. *Perry*, 150 Idaho at 227, 245 P.3d at 979. For unobjected-to acts of alleged prosecutorial misconduct, this Court reviews the alleged misconduct under a three part analysis: first, to determine whether misconduct occurred; second, whether the alleged misconduct constituted fundamental error; and third, whether the misconduct was harmless. *Id*. To establish fundamental error,

> [T]he defendant bears the burden of persuading the appellate court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) plainly exists (without the need for any additional information not contained in the appellate record, including information as to whether the failure to object was a tactical decision); and (3) was not harmless.

---

[10] Ehrlick was repeatedly impeached during the course of cross-examination. This impeachment consisted of his admission to three prior felony convictions for crimes of dishonesty, false statements under oath before another court, and exposition of multiple inconsistencies between Ehrlick's trial testimony and his earlier statements to law enforcement, including whether he placed his body weight on R.M.'s abdomen by kneeling on R.M.

The jury was undoubtedly influenced by Ehrlick's conduct during the course of the investigation and his explanations for that conduct at trial. In addition to his clear efforts to mislead investigators and providing multiple inconsistent reports, Ehrlick's explanations for his behavior included those that were beyond strange. For example, he testified that he joked with a detective about the size of R.M.'s head in response to the detective's statement that he believed that R.M.'s head caused the hole in the wall.

*Id.* at 228, 245 P.3d at 980. This test is conjunctive and permits the Court to conduct the three-pronged inquiry in the most pragmatic order. *See* Jeffrey Bower, *Clarity and Balance: Appellate Review of Harmless Error, Fundamental Error, and Prosecutorial Misconduct After State v. Perry*, 48 Idaho L. Rev. 85, 109 (2011). Ehrlick's objected-to claim of prosecutorial misconduct will be addressed first.

1. **The prosecution did not commit misconduct by stating that Ehrlick lied on multiple occasions and by calling his credibility into question.**

In closing argument, the prosecution went into great detail when addressing inconsistencies in Ehrlick's accounts of R.M.'s disappearance and Ehrlick's efforts to control the investigation. After discussing evidence illustrating Ehrlick's inconsistent statements to law enforcement, his efforts to plant evidence, and fabricate stories regarding R.M.'s whereabouts, the following exchange occurred:

> **[Counsel for the State]:** [Ehrlick] also said that his dad lied. And his dad said during the 8:26 phone call there was no mention of [R.M]. Again, he said that, from the witness stand, that his father had lied during testimony. And he said that his brother and he said that his niece had lied about all the things they said about the way that [R.M.] was treated that summer. He accused them of lying, and he told you these people are not being truthful.

> Reality is he is the one who was dishonest during his testimony. That's relevant to credibility, and that's relevant to your determination of what's going on. If he has nothing to hide, if he's innocent of what he's accused of, why does he need to come in and lie? Why does he need to lie to investigators and why does he need to lie here? He told you that he committed –

> **[Defense Counsel]:** Objection, Your Honor. I don't think it's proper for counsel to call the defendant a liar….

> **[Counsel for the State]:** Judge, we're talking about specific lies that Mr. Ehrlick told. But if that word offends counsel, I'll try to use a different word.

> **The Court:** All right, thank you.

> **[Counsel for the State]:** Ladies and gentlemen, you know that this defendant was dishonest with you when he testified.

> **[Defense Counsel]:** Objection, again, Your Honor. I don't think it's appropriate for counsel to make a comment that the defendant was dishonest in this courtroom. He can talk about things that happened before, but he can't call the witness a liar, just like I can't call his witnesses liars.

> **[Counsel for the State]:** Judge, I think it's relevant because, number one, he took the witness stand, and he accused a lot of other people of lying. He called the credibility of witnesses into question.

And, second, he admitted to being dishonest …. He changed his story a number of times when he was testifying ….

**The Court:** Okay, ladies and gentlemen, you've previously been instructed that the closing arguments are not evidence. So you've heard all the evidence, and it's up to you to determine the credibility of the individuals who have testified.

Based on the above excerpt, Ehrlick argues that the prosecution's comments amounted to more than a fair comment on the evidence and went beyond the inferences appropriately drawn from the evidence. Ehrlick argues that the prosecution, in expressing opinions on his credibility and disparaging him to the jury, interfered with the jury's ability to make an impartial decision and deprived him of his right to a fair trial.

"The general rule is that 'both parties are given wide latitude in making their arguments to the jury and discussing the evidence and inferences to be made therefrom.'" *State v. Dunlap*, 155 Idaho 345, 368, 313 P.3d 1, 24 (2013) (quoting *State v. Severson*, 147 Idaho 694, 720, 215 P.3d 414, 440 (2009)). Accordingly, in closing argument "both sides 'are entitled to discuss fully, from their respective standpoints, the evidence and the inferences' that should be drawn from it." *Id*. at 369, 313 P.3d at 25 (quoting *State v. Sheahan*, 139 Idaho 267, 280, 77 P.3d 956, 969 (2003)). "[I]n a closing argument, the parties are entitled to explain how, from their own perspectives, 'the evidence confirms or calls into doubt the credibility of particular witnesses.' " *Id*. "However, the prosecutor may not 'express a personal belief as to the credibility of witnesses, unless the comment is based solely on inferences from evidence presented at trial….' " *Id.*

The prosecutor did not engage in misconduct by commenting on Ehrlick's credibility. At no point did the prosecutor advance his personal opinion or belief that Ehrlick was a liar. Instead, the prosecutor explained how the evidence illustrated that Ehrlick was dishonest during the investigation and later at trial.

**2. Ehrlick's unobjected-to claims of prosecutorial misconduct.**

Although not the subject of objections during trial, Ehrlick argues that the prosecution committed misconduct by: (1) arguing that certain actions by Ehrlick constituted torture even though they did not fit within the Idaho Code's definition of torture; (2) misconstruing evidence presented at trial; and, (3) arguing evidence for an improper purpose.

**a. The prosecution did not commit misconduct by diminishing its burden or by attempting to modify the statutory definition of "torture."**

The indictment charged Ehrlick with first-degree murder pursuant to I.C. § 18-4001, which provides, in pertinent part:

Murder is the unlawful killing of a human being … with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being. Torture is the intentional infliction of extreme and prolonged pain with the intent to cause suffering. It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering.

At trial, the prosecution called Dr. Allen Keller, an associate professor of medicine at NYU School of Medicine. Dr. Keller specializes in "the evaluation, documentation, and treatment of individuals who've been subjected to torture and other human rights abuses." When the prosecutor asked Dr. Keller to define torture as a term of art within his medical field, he responded: "I would define torture … as severe physical or mental suffering inflicted for a variety of reasons. It could be for punishment, intimidation, attempts at eliciting information. When that's done … by someone acting in an official capacity." [11] Dr. Keller indicated that classic forms of torture generally combine physical, psychological, and social elements. Throughout the direct examination of Dr. Keller, the prosecutor repeatedly asked whether certain acts Ehrlick forced R.M. to undergo fell within the "classic definition" of torture. These acts included: dead bugging, the chair, forcing R.M. to select between multiple forms of punishment, isolation, forcing R.M. to eat oatmeal knowing that he despised it and it caused him to vomit, putting his knees on R.M's chest while R.M. was dead bugging, and striking R.M. with a board.

In closing argument, the prosecutor directed the jury to consider Dr. Keller's testimony and argued that Ehrlick's actions toward R.M. constituted torture under Dr. Keller's classic definition. The prosecutor stated:

[Ehrlick] admitted to committing acts of torture. He admitted to doing things, doing the very things that would cause the injuries that [R.M.] died from …. We're going to start first by talking about admitting to acts of torture. He told detectives, and he told you, from the witness stand, that he did a number of things to [R.M.], a number of things that Dr. Keller told you constitute torture, and that Dr. Keller told you constitute significant and serious abuse.

The prosecutor continued with a discussion of the acts Ehrlick had admitted to which Dr. Keller characterized as meeting the classical definition of torture. After recounting Dr. Keller's testimony, the prosecutor told the jury:

In order to find [Ehrlick] guilty of first-degree murder, you need to find proof beyond a reasonable doubt of each of the charges that he's been charged with ….

---

[11] When questioning Dr. Keller, the prosecutor ensured that the district court and the jury understood that Dr. Keller was testifying regarding the "classical definition" of torture rather than Idaho's statutory definition.

> Count one is first-degree murder. And the state has alleged two alternative theories of first-degree murder: One, aggravated battery on a child; the second, torture.

The prosecutor then methodically went through all the elements the jury had to find beyond a reasonable doubt in order to find that Ehrlick tortured R.M. The prosecutor informed the jury that extreme and prolonged pain and prolonged acts of brutality were separate elements stating: "extreme and prolonged pain, extreme and prolonged acts of brutality. They're separate elements, but we're going to talk about them together because it's the same type of things." The prosecution then stated: "Acts that would cause extreme pain, acts of brutality–we've talked about all these dead-bugging, both with and without the knees, the chair, the wall, hitting him with the board." The prosecution then discussed "prolonged" stating "we have to prove that these are not only acts of pain, but it's–extreme pain has to be prolonged. And the acts of brutally have to be prolonged acts of brutally."

Ehrlick contends that the prosecution's argument was tantamount to asking the jury to disregard the jury instructions, refuse to apply Idaho law, and find Ehrlick's actions were torturous because Dr. Keller believed such conduct to be torturous. Ehrlick argues that the prosecution committed "blatant error" in presenting a theme of torture, which included conduct not within statutory definition of torture.

"Misconduct may occur by the prosecutor diminishing or distorting the State's burden to prove the defendant's guilt beyond a reasonable doubt." *State v. Erickson*, 148 Idaho 679, 685, 227 P.3d 933, 939 (Ct. App. 2010). Here, Dr. Keller's extensive testimony regarding what constitutes torture under the classical definition within his field, rather than Idaho's statutory definition, was admitted without objection. Each of the prosecutor's statements that Ehrlick's treatment of R.M. constituted torture comported with Dr. Keller's testimony. The prosecutor did not claim that Dr. Keller's definition of torture governed the jury's decision. To the contrary, the prosecutor repeatedly referenced Idaho's statutory definition of "torture," broke the definition down into elements, and reminded the jury that the prosecution had the burden to prove each element beyond a reasonable doubt. We conclude the prosecution did not commit misconduct in reminding the jury of evidence admitted at trial.

### b. The prosecution did not commit misconduct by mischaracterizing evidence.

38

On cross-examination, Ehrlick testified that he dead-bugged R.M. a "couple" times in late July of 2009. Ehrlick also testified that while R.M. was in the dead-bug position, he placed his knees and body weight on R.M.'s chest and abdomen to keep him from wiggling. Ehrlick told law enforcement that this had caused bruising on R.M.'s chest in the past. On direct examination, the prosecution asked Dr. Groben whether R.M.'s fatal injury to his chest and abdomen was consistent with a 260 to 280 pound man kneeling on his chest. Dr. Groben replied: "Definitely."

In closing, the prosecutor repeatedly linked Ehrlick's admissions to Dr. Groben's testimony, arguing that Ehrlick had effectively admitted to inflicting injuries that would have caused R.M.'s fatal abdominal injury. Ehrlick takes issue with the following four statements, arguing that they misstate the evidence. First,

> Let's talk about the defendant's words. Confession by words. Again, he told you everything that you need to know to know that he is the one who killed [R.M.] He told us a couple different things. He admitted to committing acts of torture. He admitted to doing things, doing the very things that would cause the injuries that [R.M.] died from.

Second,

> [Ehrlick] also admitted to doing things that would cause [R.M.'s] fatal injuries. And again, this is how we know he's the one who killed [R.M.], because we know he's the one, he's admitting to torturing. He's admitting to doing things that would cause [R.M.'s] fatal injuries, specifically dropping the knees, something that you've heard a lot about.

Third: "[Ehrlick] admitted that the fatal blows took place in the apartment. He told us, he told us enough to know that [R.M.] suffered these fatal injuries inside that apartment when he talked about what happened on the Thursday night, July 23rd." Finally,

> We know that this defendant is the one who killed [R.M] because he had the motive to do it. He had the opportunity to do it. He told us that he tortured [R.M.]. He told us that he did those things or did things that would cause the injuries that [R.M.] suffered. And, significantly, nobody else had the opportunity to do this. And nobody else had the opportunity to do this because [R.M.] never left the house on July 24th. There were no credible sightings of that child on July 24th.

Ehrlick argues that the prosecution, in making these statements, committed misconduct by misstating the evidence. Ehrlick asserts that the prosecution's misstatements were calculated to encourage the jury to reach a verdict of guilt based on facts not in evidence and this misconduct amounted to fundamental error that is not harmless.

In closing argument, the prosecution has a duty to avoid mischaracterizing or misstating evidence. *State v. Raudebaugh*, 124 Idaho 758, 769, 864 P.2d 596, 607 (1993); *State v. Rothwell*, 154 Idaho 125, 134, 294 P.3d 1137, 1146 (Ct. App. 2013) ("It is improper to misrepresent or mischaracterize the evidence in closing argument.").

We conclude that the prosecutor's statements were proper comments on the evidence that were supported by testimony and evidence from trial. Ehrlick admitted to kneeling on R.M.'s chest while forcing R.M. to remain in the dead-bug position. Evidence was presented that Ehrlick weighed approximately 277 pounds in late July of 2009. Dr. Groben testified that a 260–280 pound man kneeling on the chest of a small boy would create the type of fatal injury that R.M. sustained to his chest and abdomen area. Because the prosecutor's closing argument amounted to a fair comment based on logical inferences supported by the evidence, we find Ehrlick's claim of misconduct to be without merit.

### c. The prosecution did not commit misconduct by arguing evidence for an improper purpose.

Ehrlick argues that the prosecution committed misconduct by arguing evidence for an improper purpose. Ehrlick takes issue with two statements made by the prosecutor during closing argument regarding whether R.M. was limping due to an ankle or leg injury in late July of 2009. First, "[w]e know that [R.M.] had prior injuries. We know that [R.M] had suffered a prior abdominal injury three to five days earlier. We know that [R.M.] was limping. Those things would affect his ability to go outside." Second, "[s]ame with the head injury. We know that there was bruising. We know that there was an ankle injury." Ehrlick contends that the only evidence that R.M. was limping or had an ankle injury was provided in conjunction with a hearsay statement that was not offered for the truth of the matter asserted. Accordingly, Ehrlick argues that the prosecution committed misconduct by offering evidence of the ankle injury as substantive evidence.

The improper presentation of evidence by a prosecutor may constitute misconduct. *State v. Severson*, 147 Idaho 694, 718, 215 P.3d 414, 438 (2009). At trial, the State called Brent Quilter, who was a detective in the Boise City Police Department's Special Victims Unit during July and August of 2009. Quilter was assigned to R.M.'s case as the lead investigator. Quilter interviewed Ehrlick on July 30, 2009, and made a recording of the interview. The transcript of

40

the interview was admitted as State's exhibit 12-16T.[12] While testifying, Quilter indicated that during the interview on July 30, Ehrlick told Quilter that R.M. had a limp. Additionally, Ehrlick's father testified that in the summer of 2009 he saw R.M. limping. Ehrlick's father described the limp as a "hard limp" and testified that the limp continued for a while. Quilter's testimony, exhibit 12-16T, and the testimony of Ehrlick's father all provided substantive evidence that R.M. sustained an ankle injury and had a limp in the summer of 2009. Therefore, this claim of prosecutorial misconduct is without merit.

### H. Cumulative error.

The cumulative error doctrine applies when there are multiple irregularities at trial. Although these irregularities may individually be harmless, their collective impact may be such as to deny the defendant a fair trial, thus violating the right to due process. *State v. Abdullah*, 158 Idaho 386, 449, 348 P.3d 1, 64 (2015); *State v. Shackelford*, 150 Idaho 355, 385, 247 P.3d 582, 612 (2010). "[A] necessary predicate to the application of the doctrine is a finding of more than one error." *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010).

In this case, we have identified three errors that, in isolation, we have determined to be harmless: (1) the admission of Martin's testimony regarding the credibility of witnesses; (2) Burnett's testimony regarding what children told her about their lack of awareness of a birthday party; and (3) the State's questioning of Ehrlick about the custody order to which he was not a party. We have considered the cumulative impact of these errors. We conclude that these errors, in combination, did not deprive Ehrlick of his due process right to a fair trial.

### V. CONCLUSION

For the foregoing reasons, we affirm Ehrlick's judgment of conviction for first-degree murder and failure to report a death to law enforcement.

---

[12] The transcript from the July 30 interview provides, in relevant part:

> DET. QUILTER: … [Jenkins] described that it was unlikely that he was outside very much when she was away from work because he got hit in the ankle one time and he'd been hobbling around on one leg because his ankle was hurt.
> MR. EHRLICK: No, his ankle was fine.
> DET. QUILTER: So is she making that up?
> MR. EHRLICK: Yeah.
> DET. QUILTER: Well, that seems like a pretty big thing to make up.
> MR. EHRLICK: Yeah.
> DET. QUILTER: Why would she make that up?
> MR. EHRLICK: He had an accident on his ankle, yes, and he was hobbling on it for a while but-
> DET. QUILTER: Okay. So he was hobbling on his ankle.
> MR. EHRLICK: Yeah, for a while.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.